IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| ISMAEL DIAZ, JR. | § | |
|     TDCJ-CID NO. 7736099 | § | |
| V. | § | C.A. NO. C-08-145 |
| | § | |
| OSCAR MENDOZA, ET AL. | § | |

**MEMORANDUM AND RECOMMENDATION
TO GRANT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AND TO DENY PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF**

In this prisoner civil rights action, plaintiff Ismael Diaz Jr. complains that he is suffering from numerous, undiagnosed medical conditions, but that defendants Dr. Maximilliano Herrera and Dr. James Fitts refuse to diagnose and/or treat him properly for those conditions. (D.E. 1, 12). Plaintiff claims further that defendant Warden Oscar Mendoza refuses to ensure that he receive proper medical care. Id.

Defendants have filed a motion for summary judgment to deny plaintiff's Eighth Amendment claims. (D.E. 27). In response, plaintiff has filed a motion for "mandatory injunction," requesting that defendants be ordered to provide him with "'correct' treatment based on his symptoms."[1]

For the reasons stated herein, it is respectfully recommended that defendants' motion for summary judgment be granted, that plaintiff's request for injunctive relief be denied, and that plaintiff's claims against defendants be dismissed with prejudice.

---

[1] Plaintiff previously filed a motion for preliminary injunction requesting the same relief. (D.E. 21). On March 13, 2009, the Court denied plaintiff's request for a preliminary injunction. (See D.E. 24, 34).

**I.      Jurisdiction.**

The Court has federal question jurisdiction.  28 U.S.C. § 1331.

**II.     Procedural background.**

Plaintiff is an inmate in the Texas Department of Criminal Justice, Criminal Institutions Division ("TDCJ-CID"), and is currently confined at the McConnell Unit in Beeville, Texas.  He filed this lawsuit on May 5, 2008, and named as defendants (1) Oscar Mendoza, (2) Dr. Herrera,  and (3) Dr. Fitts.  (D.E. 1 at 7).  Dr. Herrera and Dr. Fitts are employed by the University of Texas Medical Branch ("UTMB"), and provide contract medical services to the TDCJ-CID and its prisoners.  Id.  In his complaint, plaintiff charged that defendants denied and delayed reasonable medical care "by choosing less costly medical treatments that prove to be useless" in deliberate indifference to his health.  Id. at 10.

A Spears[2] hearing was held on July 2, 2008.  At the hearing, it was suggested that plaintiff come to Corpus Christi to articulate his claims in person.  Plaintiff expressed concern that travel in a closed van would cause him anxiety.  Thus, instead of travel, plaintiff was directed to file a more definite statement of his claims.  (D.E. 8).

On July 30, 2008, plaintiff filed his more definite statement ("MDS").  (D.E. 12).  In his original complaint and MDS, plaintiff related that in January 1999, while assigned to the Clements Unit in Amarillo, Texas, he  worked as part of the "shower crew," and was

---

[2] Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985); see also Eason v. Holt, 73 F.3d 600, 603 (5th Cir. 1996) (stating that testimony given at a Spears hearing is incorporated into the pleadings).

2

responsible for cleaning the communal inmate showers with a brush and powder soap.  Soon after he began working in the shower crew, he began experiencing sporadic rashes on his body.  In addition, he developed warts in the groin area, red, swollen feet, swollen lymph glands, a constant sore throat, and fatigue.  He was diagnosed with a fungus and given "numerous treatments."

In 2002, plaintiff was transferred to the McConnell Unit.  Once there, his symptoms worsened and he began experiencing frequent migraine headaches.  He also complained of blurred vision, eye pain,  joint pain, shoulder pain, swollen glands, sore throat, toothaches, and vomiting on a daily basis.

In his MDS, plaintiff charged that Dr. Herrera and Dr. Fitts failed to diagnose him properly, and that he needs to be evaluated by different specialists, such as a neurologist and urologist.  He alleged that Warden Mendoza supports the doctors' policy of not performing additional tests that are too costly, in deliberate indifference to his serious medical needs.

Following review of plaintiff's MDS, service was ordered on defendants.  (D.E. 15). On October 8, 2008, defendants filed their answer, and raised the defenses of Eleventh Amendment and qualified immunity.  (D.E. 17).

On February 2, 2009, defendants filed the instant motion for summary judgment. (D.E. 27).  Plaintiff filed a motion for extension of time to respond (D.E. 29), but it was denied without prejudice.  (D.E. 30).

On May 15, 2009, plaintiff filed his motion for a mandatory injunction.  (D.E. 36).

**III.     Summary judgment evidence.**

In support of their motion for summary judgment (D.E. 27), defendants offer plaintiff's TDCJ-CID medical records which total over 800 pages (DSJ Ex. A); a copy of the UTMB Health Care Policy Manual – Classification (DSJ Ex. B); Affidavit of Charles D. Adams, Southern Division Medical Director of UTMB, Correctional Managed Care (DSJ Ex. C); Affidavit of Oscar Mendoza (DSJ Ex. D); and a copy of the UTMB Health Care Policy Manual – Private Practitioner (DSJ Ex. E).

Although plaintiff has not filed an official response to defendants' summary judgment motion, in his motion for mandatory injunction (D.E. 36), he includes as "Exhibit A" a letter dated November 9, 2008, in which he relates medical experiences on November 3 and 5, 2008, and has attached printed material concerning syphilis, and a typed document about the diagnosis and treatment of meningitis.

The uncontested evidence establishes the following:

   *1.     The Year 2004.*

Plaintiff arrived at the McConnell Unit in July 2004. On July 7, 2004, he underwent a physical and mental health screening. (DSJ Ex. A at 239). It was noted that he was currently on the mental health caseload, and he was referred for a psychological evaluation. Id.

On July 13, 2004, plaintiff was seen by Physicians Assistant ("PA") Woodcroft for complaints of arthritis, chronic heel pain, warts, and phlegm in his throat. Id. at 248-49. An x-ray of his ankle was ordered, and he was prescribed insoles. Id.

On July 27, 2004, the x-rays results confirmed there was no fracture. Id. at 251.

Also on July 27, 2004, plaintiff was seen by Dr. Faust at the psychiatric clinic for evaluation. Id. at 258-59. Dr. Faust first noted that plaintiff could neither speak or understand English. Id. Plaintiff told Dr. Faust that he had homicidal thoughts about his black cell mate. Id. Dr. Faust notified the warden, and discontinued plaintiff's medications of Prozac and Nortriptyline. Id.

On August 4, 2004, plaintiff was seen by triage because he was upset that parole had been denied. Id. at 260-61.

On August 17, 2004, plaintiff saw PA Woodcroft for a physical examination. Id. at 266-67. It was noted that plaintiff was obese, had prostatitis, and depression. Id. Medications were prescribed. Id.

Throughout the rest of 2004, plaintiff was seen in the infirmary for blisters on his hand, an over-extended knee, right knee and shoulder pain, blisters, and stomach pain. Id. at 268-286). He was seen in the infirmary for each of these complaints, and medical treatment was provided. Id. On December 14, 2004, plaintiff's H. Pylori bacteria test came back positive, and he was scheduled for an infirmary appointment. Id. at 289.

### 2.  *The Year 2005.*

On January 7, 2005, plaintiff was seen by PA Lumpkin for a pain that began in his stomach, and moved to his chest. (DSJ Ex. A at 291-92). Upon examination, it was found that plaintiff's lungs, heart and stomach were normal. Id. He was prescribed Dicyclomine for reflux. Id.

In February, 2005, plaintiff was seen in the infirmary on four separate occasions in response to sick call requests complaining of blisters, stomach problems, sores on his penis, and a rash on his forearms. Id. at 302-314. In response, he was given a full course of treatment for his H. Pylori bacteria, continued on reflux medication, given a topical cream for the rash, and prescribed additional medications. Id.

In March, 2005, plaintiff submitted sick call requests (SCR) complaining of a cold, seeking a flu shot, and review of his medications. Id. at 315-32. He was seen twice in the infirmary and medications were prescribed. Id. On March 21, 2005, plaintiff met with a psychologist after receiving a disciplinary case to ensure that he was housed in the appropriate setting. Id. at 327. He was cleared for the disciplinary process. Id.

In June 2005, plaintiff complained of a hernia and continued stomach pain. Id. at 336-337. On July 13, 2005, Nurse Practitioner (NP) Heibel examined plaintiff and determined he did not have a hernia. Id. at 340. He was advised on lifestyle management.

In August 2005, it was noted that plaintiff could understand and speak English. Id. at 345-46. In addition, in response to plaintiff's stomach complaints, NP Heibel contacted Dr. Herrera regarding treatment for his H. Pylori. Id. at 350-52. Plaintiff was then seen on August 29, 2005, and was counseled on diet. Id. at 353-56. In addition, additional lab work was ordered to check for diabetes and hyperlipidermia liver function. Id. He was also referred to mental health. Id.

In September, 2005, plaintiff's lab work reflected that his chest and abdomen were normal, but his triglyceride and HDL cholesterol results were flagged as high. Id. at 370, 376. Plaintiff refused to meet with a mental health care provider. Id. at 380.at 353-56.

On September 20, 2005, plaintiff met with NP Heibel to discuss abdominal pain and management. Id. at 387-89. A new H. Pylori test was ordered. Id. at 398-99. On October 21, 2005, the H. Pylori test returned as positive. Id. at 413.

For the remainder of 2005, plaintiff was repeatedly seen in the infirmary in response to SCRs concerning thick saliva (plaintiff believed he had cancer), sexually transmitted diseases (STGs) (all tests came back negative) and other pains (medications prescribed). In all, for 2005, plaintiff was seen by medical staff in the infirmary 19 times, they responded to 28 SCRs, and conducted 11 chart reviews. Id. at 291-438.

### 3.     *The Year 2006.*

In 2006, plaintiff was seen by McConnell Unit staff 14 times. They responded to 24 SCRs, and his chart was reviewed five times. (DSJ Ex. A at 439-531)**.**

On January 11, 2006, defendant Dr. Herrera reviewed his chart. Id. at 439-440. Plaintiff's medical complaints were listed, as well as his prescribed medications. Id. Dr. Herrera noted that, based on his review, plaintiff was receiving appropriate care by mid-level providers under his supervision. Id. at 440.

Through the Spring of 2006, plaintiff continued to complain of thick saliva. Id. at 447-454. On April 24, 2006, plaintiff consulted with Dr. Turner via a tele-med conference. Id. at 459-60. Plaintiff complained of a sensation that food was becoming impacted mid-

7

esophagus, and also of nasal congestion and a scratchy throat. Id. Medications were prescribed, and Dr. Turner recommended that he be referred to gastoenterology for an endoscopy evaluation. Id. Dr. Herrera approved the request. Id. at 456, 460. The appointment was scheduled for September. Id. at 464.

On June 13, 2006, plaintiff was seen by Dr. Faust for a psychiatric individualized treatment plan. Id. at 484-86. Dr. Faust diagnosed plaintiff with adjustment reaction, discontinued his previous medications, and started him on Celexa. Id.

On August 14, 2006, plaintiff submitted a SCR to be seen for a hernia and arthritis medication; however, he did not show up for his scheduled appointment, and Dr. Fitts ordered that the appointment not be rescheduled. Id. at 495, 497.

In October, plaintiff was seen for complaints of bugs on his skin that were causing bumps. Id. at 500, 502. Plaintiff admitted that he had been using bleach on his skin for over a year. Id. Dermatitis was noted, and he was instructed not to use the bleach and on personal hygiene. Id. Plaintiff then submitted an SCR arguing that the rash was "scabies." Id. at 501, 502. He was seen again, and admitted that he was still using bleach. Id.

In November, plaintiff submitted a SCR arguing that he had psoriasis. Id. at 512. A mental health exam was scheduled. Id. In addition, Dr. Fitts advised plaintiff that his skin condition was caused by his washing his sheets in the shower and leaving them for only one

hour to dry, or from his past work on the shower crew. Id. at 513. On November 14, PA Kovalski gave plaintiff an injection of Kenalog.[3] Id. at 515.

On December 5, 2006, plaintiff met with Dr. Faust for a mental health evaluation. Id. at 521-23. Plaintiff related that his symptoms had improved, but he wanted complete relief. Id. His Celexa prescription was increased. Id.

On December 19, plaintiff submitted a SCR requesting an eye exam and new eyeglasses. Id. at 525. On December 20, he was given a visual acuity test and scheduled for further evaluation; however, the eye examination was later cancelled as there was no longer a provider. Id. at 529.

On December 26, plaintiff submitted a SCR complaining that his throat hurt, especially when he ate peanut butter. Id. at 530. PA Kovalski examined him on December 8, and found no obvious throat irritation, scarring, or signs of weight loss. Id. at 531.

### 4. *The Year 2007.*

During 2007, plaintiff was seen by McConnell Unit medical personnel 49 times; they responded to 58 sick call requests, and his chart was reviewed at least seven times. (DSJ Ex. A at 532-784). Beginning in January 2007, plaintiff was seen by Nurse Campos on the tenth, complaining of flu symptoms and a sore throat. Id. at 533-35. However, he told her that he had been experiencing the symptoms for the past 11 years. Id. He was seen in the infirmary

---

[3] Kenalog is an intra-articular/intramuscular injection that contains triamcinolone, a corticosteroid, with an anti-inflammatory effect, and is often used to treat arthritis. http://www.fda/gov/MedWatch/safety/2006/Nov_PIs/Kenalog-40Inj-PI.pdf.

9

two more times that month with throat pain. Id. at 537-540. He was also seen for heartburn and reflux. Id. at 556.

On February 1, 2007, plaintiff was seen by Optometry for new glasses. Id. at 558.

On February 8, 2007, plaintiff became upset about the Kenalog shots he was receiving, alleging that the shots were actually sex hormones. Id. at 560-61. He was referred to mental health. Id. A week later, he went to the infirmary complaining that something was burrowing into his skin. Id. at 566. On February 27, he received his new glasses. Id. at 572. The next day, he returned to medical complaining of itchy skin and chest pain. Id. at 573. Plaintiff opined that he had a fungus beneath his skin. Id. No fungus or rash was observed by PA Kovalski. Id.

Beginning in March, plaintiff began Directly Observed Therapy (DOT) where his medications were administered to him daily under the supervision of medical staff. Id. at 576. Several times, plaintiff refused to take, or did not show up to take, Zantac for his stomach. Id. at 582, 590-91, 593, 594, 602. Plaintiff complained that he had to go to the pill window for other medications and that he did not like to do that because it required him to wake up too early. Id. at 611.

In April, 2007, plaintiff was seen in the infirmary for complaints of a hernia, reflex, H. Pylori infection, arthritis, and requesting blood tests for STDs. Id. at 631-658. He was told that his chest x-rays were normal, he did not have a hernia or skin fungus. Id. at 658.

In May, plaintiff submitted a SCR for warts, rash, joint pain and "a real heavy Cerebellum." Id. at 666. He also sought a referral to a Hematologist. Id. at 674. He was

seen in the infirmary three times; once by Dr. Fitts who adjusted his high blood pressure medication. Id. at 677, 687-88, 681).

Throughout the summer, plaintiff continued to submit SCRs and to be seen for multiple complaints. On July 9, 2007, PA Gribben told plaintiff that no medical findings supported his complaints. Id. at 706. However, he agreed to order an x-ray per plaintiff's insistence. Id. X-ray results revealed clear lungs and a normal size heart. Id. at 711.

In October, 2007, plaintiff saw PA Lastrapes complaining of syphilis "hiding in his spinal cord." Id. at 729. The plan was to continue to observe him. Id. Later, due to his continued complaints of syphilis "eating his eye nerves," a urinalysis and antibiotic were ordered. Id. at 743. His urine dipstick was negative. Id. at 746. Plaintiff was told that all testing and lab results were normal. Id. at 753.

In December, plaintiff was seen for a "tingling brain," a virus that was "eating his entire body," and a fungus that was eating his lungs. Id. at 775. On December 21, 2007, Dr. Fitts conducted a physical examination. Id. at 779. Dr. Fitts told plaintiff that he was healthy and did not need further treatment. Id.

### 5. *The Year 2008.*

In February, 2008, plaintiff was diagnosed with undifferentiated Somatoform Disorder due to his continuing complaints concerning things "chewing his brain and brain stem." (DSJ Ex. A at 788-92). In addition, he was found to suffer from delusions. Id. at 794, 801-803. Mental health providers found that his numerous medical conditions were not supported by objective medical findings or observations. Id. at 804-05.

11

On February 26, 2008, Dr. Fitts saw plaintiff in response to a SCR complaining of "chewing" on the brain. Id. at 808, 813. Dr. Fitts suspected sinusitis and prescribed medications. Id. at 813.

On March 4, plaintiff saw Dr. Fitts complaining that his infection was resisting the medications. Id. at 817. Dr. Fitss noted no abnormalities. Id. at 818. On March 24, 2008, he was seen in the infirmary complaining about a chemical agent that had been used on the recreation yard. 821.Id. at   No physical distress was noted. Id.

On November 3, 2008,[4] plaintiff submitted a SCR complaining of a continued burning sensation in his feet. (D.E. 36, Ex. A at 1). NP Wagner confirmed that plaintiff did not have diabetes, and instructed him to exercise. Id.

On November 5, 2008, plaintiff saw a nurse at the 3-Building barbershop. Id. Plaintiff told her that he had experienced head pain for over a year, a temperature, nausea, stiff neck, and blurry vision. Id. She told him that the symptoms sounded like meningitis. Id. He then told her about warts on his penis and blisters on his stomach, and she stated that those symptoms sounded like syphilis. Id. In a letter dated November 9, 2008, plaintiff detailed his encounter with the nurse at the barbershop and sent it to Dr. Herrera, William Burgin, and Warden Gutierrez. Id. at 2. In addition, he attached to the letter printed materials concerning syphilis symptoms and written materials on meningitis. Id. at 3-8.

---

[4] Plaintiff's TDCJ-CID medical records for 2008 end in March; plaintiff offers the November, 2008 recitation of facts in his exhibit to his motion for mandatory injunction, D.E. 36, Exhibit A.

**IV.     Summary judgment standard.**

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52. In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file, and drawing all justifiable inferences in favor of the party opposing the motions. Caboni v. Gen. Motors Corp., 278 F.3d 448, 451 (5th Cir. 2002).

The Court may not weigh the evidence or evaluate the credibility of witnesses. See id. Furthermore, "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify on the matters stated therein." FED. R. CIV. P. 56(e); see also Cormier v. Pennzoil Exploration & Prod. Co., 969 F.2d 1559 (5th Cir. 1992) (refusing to consider affidavits that relied on hearsay statements); Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987) (stating that courts cannot consider hearsay evidence in affidavits and depositions). Unauthenticated and unverified documents do not constitute proper summary judgment evidence. King v. Dogan, 31 F.3d 344, 346 (5th Cir. 1994).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party

demonstrates an absence of evidence supporting the nonmoving party's case, the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings. Fed. R. Civ. P. 56©; Anderson, 477 U.S. at 248-49. "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." Caboni, 278 F.3d at 451. "If reasonable minds could differ as to the import of the evidence . . . a verdict should not be directed." Anderson, 477 U.S. at 250-51.

The evidence must be evaluated under the summary judgment standard to determine whether the moving party has shown the absence of a genuine issue of material fact. "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.

**V.     Discussion.**

Plaintiff complains that defendants have denied him proper medical treatment in deliberate indifference to his serious medical needs.

### A.     Deliberate indifference to serious medical needs.

The Eighth Amendment imposes a duty on prison officials to "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." Farmer v. Brennan, 511 U.S. 825, 832 (1994) (internal quotation

omitted). A prison official violates this duty when by act or omission he is deliberately indifferent to prison conditions which pose a substantial risk of serious harm. Id. at 834.

In order to state a § 1983 claim for denial of adequate medical treatment, a prisoner must allege the official(s) acted with deliberate indifference to serious medical needs. Wilson v. Seiter, 501 U.S. 294, 303.(1991); Estelle v. Gamble, 429 U.S. 97, 105 (1976); Varnado v. Lynaugh, 920 F.2d 320, 321 (5th Cir. 1991). Deliberate indifference encompasses more than mere negligence on the part of prison officials. Farmer, 511 U.S. at 837. It requires that prison officials be both aware of specific facts from which the inference could be drawn that a serious medical need exists and then the prison official, perceiving the risk, must deliberately fail to act. Id. Furthermore, negligent medical care does not constitute a valid § 1983 claim. Mendoza v. Lynaugh, 989 F.2d 191, 195 (5th Cir. 1993). See also Graves v. Hampton, 1 F.3d 315, 319 (5th Cir. 1993) ("[i]t is well established that negligent or erroneous medical treatment or judgment does not provide a basis for a § 1983 claim"). As long as prison medical personnel exercise professional medical judgment, their behavior will not violate a prisoner's constitutional rights. Youngberg v. Romeo, 457 U.S. 307, 322-23 (1982). Finally, active treatment of a prisoner's serious medical condition does not constitute deliberate indifference, even if treatment is negligently administered. See Stewart v. Murphy, 174 F.3d 530, 534 (5th Cir. 1999); Mendoza, 989 F.2d at 195; Varnado, 920 F.2d at 321. "Deliberate indifference is an "extremely high standard to meet." Domino v. Texas Dep't of Criminal Justice, 239 F.3d 752, 756 (5th Cir. 2001).

### 1. Failure to state a claim.

In his motion for mandatory injunction, plaintiff sums up his claims, stating: "...this ILLNESS it's been on my body over (9) years without medical attention." (D.E. 36, Exhibit A at 1). This claim is squarely refuted by the exhaustive medical records. As discussed above, plaintiff has been seen by McConnell Unit medical staff on a continuous basis since his arrival on the unit in July 2004. He was seen in the infirmary, and his symptoms addressed, concerning his complaints of stomach pain, chest pain, reflux, rash, genital warts, hernia, and throat pain. He was diagnosed with arthritis, high cholesterol, reflux, H. Pylori, and depression, and those ailments have been evaluated with independent tests, confirmed, treated with medication if appropriate, and held in-check throughout the last five years. He has received an eye examination and glasses. He has received mental health counseling and medication. His self-diagnoses concerning STDs, cancer, and meningitis have been evaluated and ruled out.

Medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference. Mendoza v. Lynaugh, 989 F.2d 191, 193-95 (5th Cir. 1993). Here, plaintiff's sick call request forms all bear notations from medical staff showing that they responded to plaintiff timely. In addition, these forms and other evidence in the record document that medical personnel responded to each of plaintiff's requests. Indeed, there are several notations in the record that certain medical tests and procedures were ordered, not because objective medical findings warranted them, but in an attempt to assuage plaintiff's fears.

Dr. Charles Adams, the UTMB Director for the Southern Division, reviewed plaintiff's medical records and has submitted an affidavit. (DSJ Ex. C). Dr. Adams notes that plaintiff was seen frequently "for subjective itching and a presumed rash," but that objective findings of a rash were often not found; however, he was "frequently and appropriately treated for these complaints." Adams Aff't at ¶ 8. Plaintiff admitted to washing his body with bleach and applying soap to it at night, and he was advised by medical providers to stop both. Id.

Plaintiff has a history of gastric reflux. Adams Aff't at ¶ 9. Dr. Adams finds that plaintiff was treated with the appropriate medications and referred to the GI department for endoscopy. Id. Plaintiff refused the GI appointment, but continued to receive medications for reflux. Id.

Concerning plaintiff's joint pains, x-rays were ordered. Adams Aff't at ¶ 10. However, plaintiff refused to travel for these x-rays, claiming claustrophobia and that he would not ride in a van. Id.

Dr. Adams notes further that plaintiff's complaints of headaches have been evaluated many times and treated with analgesics. Adams Aff't at ¶ 11. One x-ray revealed mild sinusitis, for which he received antibiotics. Id.

Plaintiff is seen in the chronic care clinic for his hypertension, and it is well-controlled. Adams Aff't at ¶ 12. He is seen by the mental health department for his adjustment disorder and psychosomatic disorder, and is currently on medication for these disorders. Id. at ¶ 13.

Dr. Adams reports that on January 7, 2009, plaintiff was examined by an experienced family physician and was found to have a completely normal examination. Adams Aff't at ¶ 15. No additional treatment was recommended. Id. Plaintiff has not objected to or refuted this finding.

Regarding plaintiff's frequent concerns over STDs, a recent blood test for syphilis was negative. Adams Aff't at ¶ 13. Similarly, other STDs were ruled out when the issue was raised by plaintiff.

Dr. Adams concludes:

> Based upon my review of the relevant records, it does not appear that Mr. Diaz suffered from any serious medical condition which was not addressed appropriately and in a timely fashion. Thus, based upon my education, training, and experience as a physician both in community and correctional settings, I am of the opinion that Plaintiff's allegations of "deliberate indifference" to his serious medical needs are unfounded. I believe that any other well-trained physician, under the same or similar circumstances as Dr. Herrera and Dr. Fitts, and presented with the findings they had at the time, would believe that the treatment they rendered was timely, appropriate, provided in good faith, and consistent with the Constitution of the United States and the laws of the State of Texas.

Adams Aff't ¶ 16.

Defendants' summary judgment evidence has not been refuted by plaintiff.[5] The evidence and expert testimony of Dr. Adams establish that plaintiff's serious medical needs

---

[5] Defendants have moved for summary judgment on numerous grounds including Eleventh Amendment immunity, no personal involvement by Warden Mendoza, and qualified immunity. These defenses, while valid, need not be addressed independently because the record unquestionably establishes that there is no genuine issue of a material fact that defendants were not deliberately indifferent to plaintiff's serious medical needs.

were responded to by defendants and the McConnell unit medical staff timely and appropriately. As such, plaintiff fails to establish that defendants violated his Eighth Amendment rights. They are entitled to summary judgment in their favor.

## IV. Recommendation.

For the reasons stated above, it is respectfully recommended that the Court grant defendants' motion for summary judgment (D.E. 27), and dismiss with prejudice plaintiff's claims of deliberate indifference to his serious medical needs against Warden Mendoza, Dr. Herrera, and Dr. Fitts. Moreover, because plaintiff continues to receive appropriate medicalcare, an injunction is not warranted, and it is respectfully recommended that plaintiff's motion for such (D.E. 36) be denied.

Respectfully submitted this 2nd day of June, 2009.

_____
B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel. Within **TEN (10) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to 28 U.S.C. § 636(b)(1)(C), Fed. R. Civ. P. 72(b), and Article IV, General Order No. 02-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendations in a magistrate judge's report and recommendation within TEN (10) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error*, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415 (5th Cir. 1996) (en banc).